UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA MALONE O/B/O
H.M., A MINOR,

               Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

_____/

Case No. 2:15-cv-10226
District Judge George C. Steeh
Magistrate Judge Anthony P. Patti

## RECOMMENDATION TO GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 18) AND TO DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 21)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Plaintiff's motion for summary

judgment, **DENY** Defendant's motion for summary judgment, **REVERSE** the

Commissioner's decision, and **REMAND** this case to the Commissioner and the

ALJ under Sentence Four of § 405(g) for further consideration consistent with the

report below.

**II.**    **REPORT**

    Plaintiff, Rebecca Malone on behalf of minor daughter H.M, brings this

action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of

the Commissioner of Social Security ("Commissioner") denying her application

for supplemental security income child disability.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's motion for summary judgment (DE 18), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 21), Plaintiff's reply (DE 22), and the administrative record (DE 11).

### A.    Background

On April 9, 2012, Plaintiff protectively filed an application for supplemental security income on behalf of H.M., alleging that H.M. has been disabled since January 1, 1998.  (R. at 41.)  Plaintiff's application was denied and she sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Jerome B. Blum held a hearing on May 16, 2013 and subsequently determined that H.M. was not disabled within the meaning of the Social Security Act.  (R. at 41-70.)   On November 19, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ Blum's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.    Plaintiff's Medical History

H.M. has suffered from kidney and genitourinary problems since she was very young, requiring her to self-catheterize every day and wear a Foley bag[1] at

---

[1] The FDA describes a Foley bag or Foley catheter as a "flexible tubular device that is inserted through the urethra and used to pass fluids to or from the urinary tract."   21 C.F.R. § 876.5130(a).

night.  (*See, e.g.*, R. at 161-66, 259.)   She underwent an MRI on June 15, 2011,

which revealed severe bilateral hydronephrosis and urinary bladder distension.  (R.

at 173.)  On April 5, 2012, H.M. underwent an upper gastrointestinal endoscopy,

which revealed a normal esophagus.  (R. at 191.)  On September 13, 2012, H.M.

was admitted to Crittenton Hospital Medical Center due to vomiting and sore

throat.  (R. at 259.)  The emergency department physician, Donald B. Smith, M.D.,

diagnosed her with strep throat and noted that H.M.'s "self cathing may induce

some trauma or infection."  (R. at 261.)  On November 19, 2012, H.M. was

admitted to the Royal Oak Hospital for pyelonephritis and acute or chronic kidney

injury.  (R. at 277.)  She underwent a renal ultrasound that day, which revealed

severe bilateral hydronephrosis.  (R. at 286.)

On April 15, 2013, a physician from Comprehensive Urology informed

H.M.'s treating physician, pediatrician Neda Saker, M.D., that he or she was "very

concerned" about H.M.'s noncompliance wither her intermittent catheterization

and overnight catheter drainage, noting that non-compliance could lead to

worsening renal function and likely renal failure.  (R. at 388.)  Dr. Saker completed

a functional equivalence assessment on April 19, 2013.  (R. at 408-410.)  Dr. Saker

assessed H.M. as having extreme limitations in the domains of acquiring and using

information and caring for yourself; having marked limitations in the domains of

attending and completing tasks, interacting and relating with others, and health and

physical well-being; and having less than marked limitations in moving about and manipulating objects.  (R. at 408-409.)

State agency reviewer Sarah E. Clune, D.O., completed an evaluation on May 8, 2013.  (R. at 414-15.)  Dr. Clune indicated that H.M.'s mental health impairments showed a good response to treatment.  She disagreed with Dr. Saker's findings, indicating that H.M. had less than marked limitations in interacting and relating with others and caring for yourself; a marked limitation in health and physical well-being; and no limitation in the other three domains.  (R. at 415.)

H.M. also suffered from mental impairments.  She was admitted to Havenwyck hospital on November 10, 2011 due to depression, trouble in school, cutting herself, suicidal ideation, and not sleeping well.  (R. at 175 and 177.)  Hany Mekhael, M.D., described H.M. as "easily agitated" and struggling with anxiety. (Id.)  She was discharged on December 15, 2011 with prescriptions for Lexapro, Xanax, Desyrel, and Risperdal, and instructions to follow up with her primary care physician and to keep her therapy appointment at Easter Seals.  (R. at 175.) Kingsley Thomas, M.D., described her prognosis as "good."  (R. at 177.)

H.M. presented to Easter Seals on December 14, 2011.  (R. at 208.)  She reported that her most recent bout of depression and suicidal ideation was triggered when her boyfriend broke up with her, but noted that she had been depressed and self-mutilating for the previous two years.  (R. at 218.)  She indicated that she had

attempted suicide three or four times.  She noted that she got along well with her mother, but also that there was a fair amount of conflict at home.  H.M. further reported that her relationship with her boyfriend was abusive and that a friend had attempted to rape her the year before.  On January 24, 2012, H.M. reported that she did not have suicidal ideations, but that she had cut herself superficially the day before.  (R. at 224.)  Doopyo Hong, M.D., noted that H.M. had poor concentration and an attention problem.  (Id.)  Dr. Hong further assessed that H.M. needed to "be on individual therapy first focusing on her anger issue and mood swings," followed by mother-daughter therapy.  (R. at 225.)  On April 27, 2012, Lalitha Vemuri, M.D., advised H.M. to take Adderall on the weekends and increased her dose of Lexapro.  (R. at 231.)

On April 9, 2012, H.M. reported less sadness, depression, and anger for the previous three months.  (R. at 241.)  She noted that she attended all of her psychiatric appointments and took her medicine as prescribed, which had helped to maintain her mood.  (Id.)  At her appointment on June 28, 2012, however, H.M. reported that she had an incident of wanting to self-injure and that she had been angrier since school had let out for the summer.  (R. at 338.)  According to Plaintiff, H.M. would also resist taking her medications.  H.M. indicated that she no longer wanted to attend therapy and refused to meet with her therapist at times. (Id.)  On August 1, 2012, H.M. came late to her appointment with multiple scratch

marks on her arms.  (R. at 353.)  H.M. reported that she refused to meet with the therapist who came to her home, and it was fairly clear that she had not been taking her Lexapro as prescribed, because she had not run out of it despite not seeing Dr. Vemuri since May 30, 2012.  (Id.)  On August 30, 2012, Ann Marie Ceci, MA, LPC, CAADC, CMHP, MHP, QMHP, reported that H.M. cancelled further therapy sessions, nothing that she had developed coping skills and no longer needed therapy.  (R. at 337.)  Ms. Ceci recommended future therapy focusing on H.M.'s coping skills and struggle to cooperate with her mother.  (Id.)

On June 17, 2013, H.M. underwent a mental status examination on behalf of the state agency.  The examiners, Melissa H. Rosenzweig, MA, LLP, and Nick Boneff, Ph.D., noted that H.M. was dressed in an "emo" style of clothing, with ear piercings and sweatpants.  (R. at 418.)  The examiners described her as "quite fidgety," with motor activity on the rapid side.  (Id.)  H.M. admitted to self-harm, but noted that she had not done anything since April 2013 (although she still felt a compulsion to do so).  (R. at 419.)  The examiners assessed H.M. as having moderate limitations in self-care and caring for her health and physical well-being; mild to moderate limitations in her ability to acquire and use information, and mild limitations in her ability to tend to or complete tasks.  (R. at 420.)

### C.     Hearing Testimony

At the May 16, 2013 administrative hearing, Plaintiff's attorney supplied the bulk of the statements.  He informed the ALJ that H.M., who was born on October 11, 1997, had to catheterize ("cath") herself five times per day, wore a Foley bag at night, and suffered from frequent infections due to the catheter.  (R. at 62.)  He testified that H.M. had to switch schools because of problems she was having with other kids, in part due to having to cath herself every three hours at school.  (R. at 65.)  In addition, counsel asserted that H.M. had psychiatric problems and was in a mental institute.  (R. at 63.)  He narrated that at some point H.M. "tried to kill herself, poor kid."  (R. at 65.)  Plaintiff's counsel indicated that H.M. was not sleeping and had been diagnosed with depression.  (R. at 66.)

Plaintiff testified that H.M. struggled with the frequent caths.  (R. at 67.)  For example, she has trouble finding a clean, private bathroom at school and gets teased about her illness.  (R. at 67.)  Plaintiff testified that H.M. gets five infections per year from the cath, which usually ended in "bringing her to the hospital because she gets severely dehydrated faster than normal, healthy people."  (R. at 68.)  Plaintiff testified that H.M. had trouble with bullies, and noted that she did go out with friends.  (R. at 69.)

## D.  THE ADMINISTRATIVE DECISION

### 1.      Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The Commissioner determines whether a child is disabled by analyzing three sequential steps: first, the child must not be engaged in "substantial gainful activity;" second, the child must have a "severe" impairment;[2] and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *See* 20 C.F.R. § 416.924(a).  To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment.  In addition, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the listing.  *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).  If a child's impairment does not meet a listed impairment, the impairment may be

_____

[2] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 1520(c); 920(c).

medically or functionally equal in severity and duration to the medical criteria of a listed impairment.  20 C.F.R. § 416.926a.

To determine functional equivalence, there are six "domains" that an ALJ considers: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) health and physical well-being.  20 C.F.R. § 416.926a. Functional equivalence is demonstrated by the existence of an "extreme" limitation in one of the six domains, or a "marked" limitation in two of the six.  20 C.F.R. § 4156.926a(d).  An extreme limitation is one that interferes "very seriously" with these abilities.  If the impairment or combination of impairments does not meet or medically or functionally equal a listing, the child is not disabled.  20 C.F.R. § 416.924(a).

## 2.     The ALJ's Decision

Applying this framework, the ALJ concluded that H.M. was not disabled. At Step 1, he determined that H.M. had not engaged in substantial gainful activity since April 9, 2012.  (R. at 44.)

At Step 2, the ALJ identified severe impairments of bilateral hydronephrosis, recurrent urinary tract infections, neurogenic bladder, major depressive disorder, and attention-deficit hyperactivity disorder ("ADHD").  (R. at 44.)

9

At Step 3, the ALJ found that none of H.M.'s severe impairments, either alone or in combination, met or medically equaled a listed impairment. (R. at 44.) He further found that none of H.M.'s impairments functionally equaled a listed impairment. (R. at 45.) In making this determination, the ALJ determined that H.M. had: a) no limitation in the domains of 1) acquiring and using information and 2) moving about and manipulating objects; b) a less than marked limitation in 1) attending and completing tasks, 2) interacting and relating with others, and 3) the ability to care for herself; and c) a marked limitation in health and physical well-being. (R. at 47-53.) As a result, the ALJ concluded that H.M. had not been disabled since April 9, 2012. (R. at 54.)

### E. STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997));

*see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F. ANALYSIS

Plaintiff raises four main arguments. First, she contends that the ALJ's finding that H.M. had less than marked impairments in caring for herself is not supported by substantial evidence. Second, she makes the same argument with respect to the ALJ's finding that H.M. has a less than marked limitation in interacting and relating with others. Third, she asserts that substantial evidence establishes that H.M. has an extreme impairment in the domain of health and physical well-being. Finally, she argues that the ALJ erred by improperly discounting the opinion of her treating physician. The Commissioner opposes the motion, asserting that the ALJ's conclusions were supported by substantial evidence. I conclude that the ALJ's analysis in the domain of "ability to care for yourself" was not supported by substantial evidence.

### 1.   The ALJ's Analysis in the Domain of "Caring for Yourself" is not Supported by Substantial Evidence.

Because the ALJ found that H.M.'s impairments caused a "marked" impairment in the domain of health and physical well-being, a marked impairment in a second domain necessitates a finding of disability. 20 C.F.R. § 416.926a(a). Here, Plaintiff contends that the ALJ's analysis that H.M. has a less than marked impairment in the domain of caring for herself was not supported by substantial evidence.  I agree.

In the domain of "caring for yourself," the Commissioner considers "how well [the claimant] maintain[s] a healthy emotional and physical state," including how well he or she gets her "physical and emotional wants and needs met in appropriate ways," how she copes with "stress and changes in [her] environment," and whether she takes care of her "own health, possessions, and living area."   20 C.F.R. § 416.926a(k).  Here, the ALJ reasoned that, although H.M. had a "history of superficial cutting and controlling her anger," the frequency of such self-mutilation "decreased significantly" after she began therapy.  (R. at 52.)  He pointed to a June 2012 appointment in which H.M. reported that she had come up with other coping skills and was committed to not return to her previous behaviors. (Id.)  He also noted that she engaged in age-appropriate activities, grooming, and hygiene.

13

Plaintiff asserts that the ALJ's rationale was based on selective citation to a few "isolated scraps of evidence," which he also misstated.  (DE 18 at 11.) Plaintiff first takes issue with the ALJ's contention that H.M.'s self-mutilation decreased after beginning therapy, noting that the reports on which the ALJ relied followed an extensive history of self-mutilation and several suicide attempts.  (DE 18 at 12.)  Plaintiff contends that H.M. missed or refused treatment after June 1, 2012, so the reports on which the ALJ relied only evidenced her condition in April and May of that year.  For example, she points to a June 28, 2012 periodic review from the Easter Seals, in which Ms. Ceci indicated that H.M. had "one incident (2 weeks ago) of feeling self-injurious in response to having a lot of stress."  (R. at 338.)

As Plaintiff points out, the Regulations describe the following with respect to the domain at issue:

> Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, *making decisions that do not endanger yourself, and knowing when to ask for help from others*.

20 C.F.R. § 416.926a(k)(1)(iv) (emphasis added).  The Regulations go on to list examples of limited functioning in caring for yourself but qualify the list of examples by noting that "the examples do not necessarily describe a "marked" or "extreme" limitation." Among the seven listed examples of limited functioning is

14

"engag[ing] in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignor[ing] safety rules." *Id*.

Plaintiff argues that, instead of recognizing that H.M.'s medical condition left her unable to judge what was best for her, the ALJ interpreted her refusing therapy as an admission that her mental condition was not as severe as she reported. According to Plaintiff, the ALJ made the same error with respect to her sometime failure to self-catheterize.

The Commissioner counters that the ALJ did not ignore Plaintiff's history of self-mutilation, suicidal ideation, and hospital treatment for her mental health issues, but actually explicitly mentioned those issues. (R. at 46.) She further argues that the ALJ did not use H.M.'s "sometime failure to self-catheterize" as a basis to question her credibility. (DE 21 at 16.) According to the Commissioner, this discussion was merely an accurate summary of the record, and his decision to find a less than marked impairment was echoed by Dr. Sarah E. Clune. (R. at 414.)

Plaintiff's argument on this issue has merit. The Commissioner does not address the ALJ's treatment of H.M.'s refusal to see her therapist, despite "the apparent effectiveness of treatment." (R. at 46.) While the Commissioner is correct that the ALJ did not technically discount Plaintiff's credibility based on

15

H.M.'s failure to self-catheterize, he explicitly did so with respect to her refusal to continue therapy. The ALJ's decision reads as follows:

> Despite the apparent effectiveness of treatment, the claimant essentially stopped attending therapy sessions in June 2012, despite the fact that the therapist visited her in her home. The claimant was discharged from treatment at the end of August 2012. It appears that the claimant's pediatrician is currently prescribing psychotropic medications, but there is no evidence that she has received any treatment from a therapist or psychiatrist since that time. *This suggests that Ms. Malone's allegations regarding the severity of claimant's psychiatric symptoms are not entirely credible*.

(R. at 46) (emphasis added.) The ALJ, therefore, used H.M.'s failure to continue therapy as a reason to discount Plaintiff's credibility, but did not address this failure in his analysis of H.M.'s ability to care for herself. (*See* R. at 52.) However, H.M.'s decision to discontinue therapy (that the ALJ considered effective and that the therapists at Easter Seals recommended she continue) seems to weigh *against* her ability to make decisions that do not endanger her and to know when to ask for help from others.

In addition, the record seems to contradict the ALJ's conclusion that there was no evidence that H.M. continued to self-mutilate after stopping therapy and that her condition improved with the use of psychotropic medication. Instead, an August 1, 2012 record indicates that H.M. reported to Dr. Vemuri that the medication was *not* working to address her depression and self-mutilation. (R. at 358.) Dr. Vemuri reported that, on the same day, H.M. had "multiple scratch

marks on both arms . . . did that 2 nights ago after boyfriend broke up with her . . . ." (R. at 353.) The Commissioner dismisses this as a "single scratching incident" that does not upend the ALJ's entire determination. (DE 21 at 17.) However, the ALJ erred by considering H.M.'s refusal to attend therapy only as a reason to discount her credibility, and not with respect to her ability to care for herself. In addition, he overstated H.M.'s improvement with the use of psychotropic medication. As a result, I recommend that the Court remand the matter back to the ALJ with instructions to re-analyze H.M.'s impairments with respect to the domain of "caring for yourself" in conformity with the concerns I have just highlighted.

### 2.    The ALJ Should also Re-Analyze the Domain of Interacting and Relating with Others.

Because a proper analysis of H.M.'s ability to care for herself could lead to a decision that she is disabled, this Court need not address Plaintiff's additional arguments.[3] However, I recommend that the ALJ address a further, troubling issue

---

[3] I have, however, reviewed Plaintiff's two remaining arguments and do not find them to have merit. First, with regard to Plaintiff's argument related to the ALJ's finding of only a marked impairment in the domain of health and physical well-being, the Commissioner correctly points out that the ALJ explicitly discussed H.M.'s medications and treatments in accordance with 20 C.F.R. § 416.926a, along with the fact that the record revealed only one hospitalization for dehydration associated with a urinary tract infection. (R. at 53.) Second, with respect to Plaintiff's argument that the ALJ failed to appropriately weigh the opinion evidence, substantial evidence supports the ALJ's treatment of Dr. Saker's opinion and he gave good reasons for discounting its weight, including the lack of explanation for her findings, the report of frequent hospital visits related to UTIs,

on remand, in his analysis that H.M. has less than marked limitations in the domain of interacting and relating with others.  Specifically, the ALJ notes approvingly that H.M. has been able to "establish intimate relationships in the past."  (R. at 50.) It is unclear to me whether the ALJ is referring to H.M.'s former boyfriend, who she reported was abusive toward her.  (R. at 218.)  Even the Commissioner concedes that "it would have been better if the ALJ did not go down this road." (DE 21 at 20.)  The ALJ should further explain his analysis in this area to be clear as to whether he is basing, to any extent, his conclusions regarding H.M.'s ability to interact and relate with others on her long-term abusive relationship.  If so, he should give additional detail as to how this factors into and affects his analysis, and how he weighs this fact relative to others in support of this finding.

### 3.    Remand Under Sentence Four

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)."  *Faucher v. Sec'y of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir.1994) (citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to

which is not supported by the record, and the fact that Dr. Saker is a pediatrician, and not a urologist or therapist.  .

"enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing.  42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue,* 10–207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher,* 17 F.3d at 174); *see also White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 790 (6th Cir. 2009) ("If a court determines that substantial evidence does not support the [Commissioner's] decision, the court can reverse the decision and immediately award benefits only if all factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." (internal quotations omitted)).  Here, there is insufficient support for the ALJ's findings and the factual issues have not been resolved.  Accordingly, I recommend that the Court remand this case under Sentence Four: 1) for further consideration of H.M.'s impairments with respect to the domain of "caring for yourself"; and 2) to clarify or further develop his analysis of Plaintiff's impairments in the domain of interacting and relating with others.

## G.   CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42

U.S.C. § 405(g).  Accordingly, the Undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for summary judgment (DE 18), **DENY** Defendant's motion for summary judgment (DE 21), **REVERSE** the Commissioner of Social Security's non-disability finding, and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.


Dated: December 9, 2015          s/Anthony P. Patti
                                 Anthony P. Patti
                                 UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on December 9, 2015, electronically and/or by U.S. Mail.

                                 s/Michael Williams
                                 Case Manager for the
                                 Honorable Anthony P. Patti